J-A02017-14

2014 PA Super 184

| | |
|---|---|
| VINCENT P. NERTAVICH, JR. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| PPL ELECTRIC UTILITIES, KTA, KTA-TATOR, INC., KTA/SET ENVIRONMENTAL, S-E TECHNOLOGIES, INC., ALEXANDER ANDREW, INC., D/B/A FALLTECH, ALEXANDER ANDREW, INC., FALLTECH, THOMAS & BETTS CORP., THOMAS & BETTS CORP., D/B/A OR T/A MEYER STEEL STRUCTURES, F/K/A I.T.T. - MEYER INDUSTRIES, F/K/A MEYER INDUSTRIES, MEYER STEEL STRUCTURES F/K/A I.T.T.- MEYER INDUSTRIES, F/K/A MEYER STEEL STRUCTURES, ITT-MEYER INDUSTRIES, MEYER INDUSTRIES, MEYER MACHINE, INC. AND WINOLA INDUSTRIAL, INC. | |
| APPEAL OF: PPL ELECTRIC UTILITIES CORPORATION | |
| | No. 3415 EDA 2012 |

Appeal from the Judgment Entered December 5, 2012
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): No. 2316 Sept. Term 2009

BEFORE: FORD ELLIOTT, P.J.E., OTT, J., and STRASSBURGER, J.[*]

_____

[*] Retired Senior Judge assigned to the Superior Court.

OPINION BY OTT, J.:                                        **FILED AUGUST 27, 2014**

PPL Electric Utilities, Corporation ("PPL") appeals from the judgment of $2,494,542.35, entered December 5, 2012, in the Philadelphia County Court of Common Pleas, in favor of Vincent P. Nertavich, Jr., for the injuries he sustained when he fell 40 feet while working as the employee of an independent contractor[1] hired to paint PPL's electric transmission poles.[2] On appeal, PPL argues the trial court erred in failing to grant judgment notwithstanding the verdict (j.n.o.v.) or a new trial. For the reasons set forth below, we conclude that PPL was entitled to the grant of j.n.o.v., and, accordingly, reverse the judgment entered in favor of Nertavich.

The facts underlying this appeal are summarized by the trial court as follows:

> Defendant PPL owns 90-foot-high, 10-foot-in circumference tubular steel electric transmission poles. Some of these poles need to be repainted from time to time to prevent structural decay. PPL contracted with QSC [Painting, Nertavich's] employer, to paint the poles. The contract called for work to begin in August 2007 and be completed by November 2007. It directed that "[a]ll work shall be performed according

---

[1] QSC Painting ("QSC") was Nertavich's employer.

[2] Nertavich's claims against the named defendants, with the exception of PPL and Thomas & Betts Corp., were either dismissed by the trial court or settled prior to trial. Thomas & Betts was the manufacturer of both the electric transmission pole and ladder upon which Nertavich was working when he fell. Nertavich's products liability claim with respect to the manufacture and sale of the pole was dismissed pretrial by summary judgment. His claim with respect to the ladder proceeded to trial, but the jury found Thomas & Betts was not negligent.

to the attached PPL EU 'Specification for the Maintenance Painting of Transmission Structures' revision dated 8/3/07."

That PPL Specification document contained a variety of detailed requirements about the job. It prescribed each step how to paint the poles.

. . . .

While the workmen painted, power might continue to surge through the lines attached to the poles. As a result, the workers had to take "extra precautions when painting near insulators, making sure that paint does not splatter or drip onto insulators," and the workers would not be allowed to wipe paint off the insulators. Also, PPL maintained control over the worksite: PPL supplied an "Authorized Representative," also known as a contract field representative, for the project who was "the daily source of contact … in areas of any question, materials, quality assurance, general safety, work procedures and schedule." PPL had to go to the power substations and set the circuit breakers so that the workers would not be electrocuted. PPL employed a "green tag" procedure where the PPL representative would not allow workers on the poles until the lines were set.

Pursuant to PPL's internal guidelines for safety and health procedures, the PPL field representative had the duty to "monitor the contractor to ensure that safety requirements of the contract are adhered to … [and] observe the contractor's performance." The PPL field representative had the authority to "stop the contractor's work for severe or repeated safety violations," and "if the PPL Field Representative observes an unsafe work practice involving a direct threat or imminent danger, the field Representative immediately will direct that all work stop[.]"

PPL's poles dated from the 1980s. The poles were custom ordered from Defendant Thomas & Betts, with PPL establishing their specifications. The pole specifications included the dimensions of the pole, its paint, and the number and type of attachment points. PPL was aware that the poles would need repainting every 15 to 20 years. PPL did not specify that the poles should have any vangs[, *i.e.*, pieces of metal,] welded onto them so that a worker's lanyard or other suspension device could attach to the pole. The only attachment points on the poles, besides those at the top of the poles and on the arms for electrical wires, were a series of brackets running up one side of

the pole. These brackets served as attachment points for removable single-rail ladders, known as "chicken" ladders. They are known as "chicken" ladders because they are unstable and wobble, frightening workers. There was no place for a worker climbing the pole to attach a lanyard or lifeline, except for somewhere on these ladders. There were two types of ladders. Both consisted of a central metal beam with metal pegs protruding out to the left and right. The first, termed a working ladder, had parallel pegs on each side to give the appearance of a straight bar across the rail so that a worker could stand level. The second type, the climbing ladder, had alternating pegs staggered at regular intervals up each side of the rail. The ladders came from the manufacturer with two bolts that attach through their bottom to secure them to the pole. QSC, not having another means of lifting its workers into place to paint the pole, asked PPL for the removable ladders. PPL provided QSC with the ladders, but not with the bolts.

On September 23, 2007, … Nertavich was 40 feet off the ground working on a PPL pole. More experienced workers were painting the pole above him. He was standing on one of the climbing ladders. QSC provided [Nertavich] with a pole belt, a body harness, and two lanyards. One lanyard was to attach to the pole belt, and the other was to attach to the body harness to serve as a lifeline. [Nertavich] used only the pole belt and one lanyard. He testified at trial that on previous jobs he had used only the pole belt and one lanyard, and that no one told him he had to use the harness as well.[3] The one lanyard he used was coated in dried paint. [Nertavich] tied the paint-coated lanyard to the ladder above him, a working ladder, by looping it around a left peg. [Nertavich], holding on to the lanyard, leaned out to his left to slap paint on a hard-to-reach spot on the back of the pole. The ladder above him to which he was tied off wobbled several inches to the left. The lanyard unlooped. [Nertavich] fell 40 feet, landing on his feet. The fall fractured his feet, dislocated his ankles, fractured his knee, his right femur, his right hip, and burst several of his lumbar spine disks.

_____

[3] Indeed, Nertavich admitted that his body harness was in his truck on the day of his accident. N.T., 3/1/2012, at 129-130.

[Nertavich] lost 3 inches in height as his body literally compacted from the fall.

Trial Court Opinion, 6/14/2013, at 2-6 (footnotes and record citations omitted).

Nertavich initiated this personal injury/products liability action by *writ* of summons on September 23, 2009. After filing a complaint and first amended complaint, Nertavich filed a second amended complaint on April 21, 2011. The named defendants included the "product defendants" – Falltech, Thomas & Betts, and Winola Industrial, Inc. – which designed, manufactured, and/or sold fall protection equipment, the electric transmission poles, and the single-rail ladders[4] – and the "utility defendants" – PPL and KTA/Set Environmental, the owner of the utility poles and an engineering consulting company hired to oversee the painting work, respectively. Nertavich raised claims of general negligence, professional negligence, strict liability, and breach of warranty, as well as sought punitive damages.

PPL filed a motion for summary judgment on July 5, 2011, which the trial court denied on September 1, 2011.[5] The case proceeded to a jury

_____

[4] These ladders were also referred to as "chicken ladders," "climbing assists," and "McGregor ladders" throughout the trial.

[5] The other defendants also filed motions for summary judgment. Relevant to this appeal, Thomas & Betts filed a motion for partial summary judgment, arguing that Nertavich's products liability claim with respect to the manufacture and design of the transmission pole was barred by the statute
*(Footnote Continued Next Page)*

trial, commencing in February of 2012. PPL moved for a nonsuit at the conclusion of Nertavich's case-in-chief, and a directed verdict at the close of all testimony, both of which were denied by the trial court.[6] On March 9, 2012, the jury returned a verdict in favor of Nertavich in the amount of $4,613,150.00. However, the jury found PPL 51% causally negligent for Nertavich's injuries, and Nertavich, himself, 49% causally negligent for his injuries. The jury also found that the ladder designed by Thomas & Betts was not defective.[7]

Both parties sought post-trial relief. On March 13, 2012, Nertavich filed a motion for delay damages, and, on March 19, 2012, PPL filed post-trial motions seeking j.n.o.v. or a new trial. The trial court granted Nertavich's motion, and, on April 9, 2012, entered a molded verdict in the amount of $2,494,542.35 in favor of Nertavich and against PPL.[8] Thereafter, on November 26, 2012, the trial court denied PPL's post-trial motion, and on

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

of repose. **See** 42 Pa.C.S. § 5536. The trial court agreed, and dismissed that claim. **See** Order, 9/1/2011.

[6] The trial court did, however, grant PPL's motion for a nonsuit with regard to Nertavich's claim for punitive damages. N.T., 3/7/2012, at 137.

[7] Accordingly, Thomas & Betts has not filed a brief in this appeal.

[8] The molded verdict reflects both a reduction in the total award based upon the jury's finding Nertavich 49% liable, and the addition of delay damages.

December 5, 2012, judgment was entered on the verdict. This timely appeal

followed.[9]

PPL raises the following four issues on appeal:

(1)  Is PPL entitled to judgment notwithstanding the verdict for injuries sustained by an employee of an independent contractor when controlling Pennylvania law, as reflected in <u>Beil v. Telesis Construction, Inc.</u>, 608 Pa. 273, 11 A.3d 456 (Pa. 2011), requires that PPL exercise significant control over the manner, methods, means, and operative detail of the portion of the independent contractor's work that is specifically related to the accident, and the evidence at trial established that the independent contractor itself directed and exercised control over its work?

(2)  Is PPL entitled to a new trial on liability when the Court improperly permitted Nertavich to introduce evidence of PPL's other purported duties – including such things as PPL's internal guidelines, OSHA, NESC, the duties of PPL's onsite safety representative, and a common law duty to hire competent contractors – when those purported duties are inconsistent with <u>Beil</u> or otherwise inapplicable under the law?

(3)  Is PPL entitled to a new trial on liability when the Court instructed the jury contrary to <u>Beil</u>?

(4)  Is PPL entitled to judgment notwithstanding the verdict when the evidence established that Nertavich assumed the risk of his fall?

PPL's Brief at 3-4. Because we conclude that PPL is entitled to j.n.o.v. on its

first issue, we need not address its remaining claims.

---

[9] The trial court did not direct PPL to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

First, PPL contends it is entitled to j.n.o.v. because Nertavich failed to establish that it retained control over the manner, methods, means, and operative detail of the work of Nertavich's employer that was sufficient to overcome the general rule that an owner owes no duty to the employees of an independent contractor.

"A [j.n.o.v.] can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant." *Egan v. USI Mid-Atl., Inc.*, 92 A.3d 1, 19-20 (Pa. Super. 2014) (citation omitted). Our review of a trial court's decision granting or denying a post-trial motion for j.n.o.v. is well-established:

> When a court reviews a motion for judgment n.o.v., the reviewing court considers the evidence in the light most favorable to the verdict winner, who must receive the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his or her favor. A judgment n.o.v. should only be entered in a clear case.

*Beil v. Telesis Const. Inc.*, 11 A.3d 456, 462 (Pa. 2011) (citations omitted). Further, we will not substitute our judgment for that of the fact finder when it comes to questions of credibility and weight of the evidence. *Egan*, *supra*, 92 A.3d at 20 (citation omitted).

In *Beil*, the case upon which PPL relies for support of its appeal, the Pennsylvania Supreme Court reiterated the century old "accepted and general rule … that a landowner who engages an independent contractor is

**not responsible** for the acts or omissions of such independent contractor or his employees." **Beil**, **supra**, 11 A.3d at 466 (emphasis supplied).

> This foundational law is based upon the long-standing notion that one is not vicariously liable for the negligence of an independent contractor, because engaging an independent contractor "implies that the contractor is independent in the manner of doing the work contracted for. How can the other party control the contractor who is engaged to do the work, and who presumably knows more about doing it than the man who by contract authorized him to do it? Responsibility goes with authority." **Silveus v. Grossman**, 307 Pa. 272, 278, 161 A. 362, 364 (1932).

**Id.**

However, this general rule is subject to certain exceptions. Relevant to the present case is the "retained control" exception set forth in Section 414 of the Restatement (Second) of Torts:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Restatement (Second) of Torts § 414 (1965).

The **Beil** Court discussed the degree of control necessary to hold an owner liable for injuries suffered by an employee of an independent contractor under Section 414:

> The primary question in many premises cases, as is the issue before us, is whether the property owner hirer of the independent contractor retained sufficient control of the work to be legally responsible for the harm to the plaintiff. Comment c to Section 414 provides the most commonly used test for determining whether an employer/landowner retained sufficient control. More precisely, comment c speaks to the degree of

control necessary for the exception to overcome the general rule against liability. Comment c makes manifest that the right of control must go beyond a general right to order, inspect, make suggestions, or prescribe alterations or deviations, but that there must be such a retention of the right of supervision that it renders the contractor not entirely free to do the work in his own way:

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. **Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.**

> Restatement (Second) of Torts § 414, cmt. c (emphasis added); **see also Hader**[ **v. Coplay Cement Mfg. Co.**, 410 Pa. [139,] 150–52, 189 A.2d [271,] 277–78 [(1963] (rejecting assertion that site visitation and provision of technical advice regarding installation of machinery did not demonstrate control of workplace). **The control required to implicate the exception to the general rule against liability can be demonstrated in two ways. First, a plaintiff may point to contractual provisions giving the premises owner control over the manner, method, and operative details of the work. Alternatively, the plaintiff may demonstrate that the land owner exercised actual control over the work.** As a general proposition, the question of the quantum of retained control necessary to make the owner of the premises liable is a question for the jury. When, however, the evidence fails to establish the requisite retained control, the determination of liability may be made as a matter of law.

**Id.** at 466-467 (emphasis supplied in part). The Court also noted that, in

prior decisions, it construed the "retained control" exception narrowly. **Id.**

at 467, *citing* **Hader**, **supra**; **Farabaugh v. Pennsylvania Turnpike Com'n**, 911 A.2d 1264 (Pa. 2006).

In the present case, the trial court found the quality of control PPL exercised over the jobsite was sufficient to submit to the jury the question of whether the "quantity of control necessary to make PPL liable existed." Trial Court Opinion, 6/14/2013, at 17. Specifically, the court determined that Nertavich presented sufficient evidence to find that PPL controlled the "operative details" of QSC's work:

> Here, PPL through its contract and specifications told QSC workers what paint to use, and every step of how to use it. It told the workers to lay out tarps beneath the poles, to mix and stir the paint, to clean and dry the poles, to paint the poles with rollers, brushes, and mitts, to let the paint dry hard and firm, then to apply successive coats, to clean up the work area by disposing of paint containers and debris, and finally to make spot repairs – in a specific feather-edged manner – when directed to do so by PPL. PPL's own contract manager testified at trial that these provisions told QSC workers how to perform the operative details of their job.
>
> The contract also called for safety provisions to be followed, and established the posisiton of the PPL contract field representative. PPL's contract field representative, Mr. Grim, was at the worksite every day, and knew that it was his duty to stop work if he saw an unsafe condition, even if he was not knowledgeable enough to know when such a condition existed. Mr. Grim was supposed to hold safety meetings every day for the workers, even though he did not. He had the duty to inspect worker fall protection.
>
> Also, PPL exerted great control over access to the property. Through its green tag procedure, PPL retained control of the property, and significantly limited worker access to the poles because of live electric wires. Workers could not get on the poles until Mr. Grim let them. Also, the available ways to scale the poles were essentially limited to the single-rail ladders

because the poles were energized, and there were no other attachment points on the poles to rig other climbing devices. QSC had to request these ladders from PPL to climb the poles.

These facts, especially the way in which PPL dictated how QSC workers were to perform their painting work coupled with evidence of control over safety and access, evince the quality of control that the Supreme Court found lacking in *Beil*. The qualitative element being present, it was for the jury to determine if the quantity of control necessary to make PPL liable existed. There were ample facts in evidence, including the contract and testimony from PPL's own employees, for the jury to determine that the necessary quantum of control existed as they did.

*Id.* at 16-17 (footnote omitted).

Conversely, PPL argues the type of control Nertavich claims it retained over the jobsite in this case is the same type of control the Supreme Court found insufficient in *Beil*. Moreover, PPL contends that Nertavich's attempt to "end-run *Beil* through a so-called theory of 'direct negligence'" also fails. PPL's Brief at 34. Accordingly, it asserts that it is entitled to j.n.o.v. as a matter of law. We agree.

*Beil* is the Supreme Court's most recent, and arguably most relevant, decision on the issue of landowner liability for injuries sustained by the employee of an independent contractor. A discussion of the facts and disposition in *Beil* will be helpful to our resolution of the present case. They are as follows.

Lafayette College ("the College") hired Telesis Construction, Inc. ("Telesis") as the general contractor to renovate an engineering building. Telesis subcontracted the roofing work to Kunsman Roofing and Siding ("Kunsman"). Beil was an employee of Kunsman. The College also

- 12 -

contracted separately with Masonary Preservation Services, Inc. ("MPS") to restore stonework on the exterior of the building. On the day of the accident, Beil was installing flashing on the roof. He used scaffolding erected by MPS, after consultation with the College, to access the roof. While ascending the ladder with 15 pounds of flashing, he fell 30 feet, and sustained serious injuries. Beil subsequently filed a personal injury action against the College, Telesis, and MPS. A jury awarded damages of $6.8 million, and apportioned liability as follows: Telesis 50% liable, the College 35% liable, MPS 10% liable and Beil 5% liable. The College appealed, and this Court reversed and remanded for the entry of j.n.o.v. in favor of the College. Beil then petitioned the Supreme Court for allowance of appeal. *See Beil*, *supra*, 11 A.3d at 458-462. On appeal, the Supreme Court affirmed the decision of the Superior Court, holding that "the College did not retain sufficient control of the premises to subject it to liability pursuant to Section 414 of the Restatement (Second) of Torts[.]" *Id.* at 472.

Specifically, the Supreme Court rejected Beil's claim that the College retained control of the premises in two broad categories: safety and access. *Id.* at 467. With regard to safety, Beil argued the College "controlled safety matters at the site with respect to Telesis and Kunsman, as well as MPS[.]" *Id.* He presented the following evidence in support of that claim: (1) Telesis was contractually obligated to comply with the safety directives of the College; (2) the College's on-site project manager was consulted as to where to place the scaffolding; (3) the College's project manager admitted in

a post-accident email that the roofers were working in a potentially unsafe manner and stated the College's desire for a safe work environment; and (4) expert testimony that the College controlled safety at the site. *Id.* With regard to access, Beil similarly claimed that "the College's denial of access to certain areas stands as evidence of its control over the renovation work." *Id.* at 469. In support of this contention, he produced evidence that: (1) the College denied the roofers access to certain areas of the building; (2) the subcontractors had to obtain written permission to enter the building; and (3) the College hired MPS, whose scaffolding was used, and the College was consulted as to where to place the scaffolding. *Id.* at 469-470.

However, the Supreme Court held that a property owner may retain a certain degree of authority over safety issues, as well as regulate the use of and access to buildings, without "retaining control" of the premises for liability purposes. With regard to safety, the Court held "a property owner retaining a certain degree of authority over safety issues, such as supervising and enforcing safety requirements, and even imposing its own safety requirements at a work site, does not constitute control for purposes of imposing liability." *Id.* at 469 (footnote omitted). Rather, a property owner's interest in monitoring the safety of its contractors constitutes sound public policy. *Id.* at 468.

Furthermore, with regard to access, the Court held the College's regulation of the use of and access to the building was "tangential to the substantive work of the contractor, and subcontractor[,]" and "did not

control the way the workers did their work." *Id.* at 471. Rather, the Court explained,

> the College's conduct regarding placement of MPS' scaffolding [did] not directly relate to the decision of Kunsman's employees to use MPS' ladders and scaffolding instead of Kunsman's own equipment, which Kunsman contracted to provide, and Telesis contracted to ensure was safe. While MPS permitted the Kunsman roofers to use its scaffolding, Telesis did not anticipate or rely upon the use of MPS scaffolding for access to the roof, and access was for Kunsman to determine.

*Id.* Accordingly, the *Beil* Court concluded that "although the College exercised certain authority regarding safety and regulated access to, and use of, certain areas of the premises, this is not the type of conduct that constitutes control as contemplated by the Restatement." *Id.* at 472.

In the present case, however, the trial court opined that the facts presented by Nertavich "especially the way in which PPL dictated how QSC workers were to perform their painting work coupled with evidence of control over safety and access, evince the quality of control that the Supreme Court found lacking in *Beil*." Trial Court Opinion, 6/14/2013, at 17 (footnote omitted). Nertavich agrees, arguing that "PPL was intimately involved in, or had the right to be, in every aspect of the operational detail of QSC's performance[,]" as evident both in the contract provisions, as well as PPL's actual exercise of control at the jobsite. Nertavich's Brief at 23. Conversely, PPL contends that the "categories of supposed 'control' [the trial court found to be sufficient in the present case] are the very same theories of control

rejected by **Beil** and its ancestors." PPL's Brief at 21. For the reasons that follow, we agree.

With respect to the contract provisions,[10] the trial court first found that PPL's painting specifications – which included such details as the specific type of paint to use, how to apply the paint (*i.e.*, by concealing brush marks, without runs, by applying a uniform finish and thickness, etc.), and the requirement of "feather-edg[ing]" for spot repairs[11] – constituted control over the operative details of QSC's work sufficient to find it "retained control" of the job site for liability purposes. However, PPL contends these "quality specifications" do not evince sufficient control over QSC's work to hold it liable for Nertavich's injuries. More importantly, these quality specifications had nothing to do with Nertavich's accident. Indeed, PPL argues "Nertavich presented no evidence at trial that PPL ever instructed or directed QSC workers how to tie off to the pole, how to climb the pole, or which equipment to use." PPL's Brief at 23.

_____

[10] "The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself." **Lesko v. Frankford Hospital-Bucks County**, 15 A.3d 337, 342 (Pa. 2011) (quotation omitted).

[11] **See** Contract, 8/30/2007, Attachment A, at 2, ¶ 17.

The Commonwealth Court's decision in **LaChance v. Michael Baker Corp.**, 869 A.2d 1054 (Pa. Commw. 2005), is instructive.[12] In that case, Michael Baker Corp. ("Baker") was awarded a contract by PennDOT to improve a section of Route 6015 in Tioga County, which included laying reinforced concrete pipes, six feet in diameter, underground. LaChance, an employee of Baker, suffered fatal injuries when the trench he was working in collapsed as he was grouting the outside of these pipes. **Id.** at 1055. LaChance's Estate filed a wrongful death and survival action against both Baker and PennDOT, arguing the latter was negligent in failing to supervise Baker and inspect the trench that collapsed. The trial court granted summary judgment in favor of PennDOT, finding, *inter alia*, that the Estate failed to establish PennDOT "retained control" of the job site sufficient to overcome the general rule that a landowner is not liable for the negligence of its contractors. **Id.** at 1056.

On appeal, the Commonwealth Court affirmed the grant of summary judgment. First, the Court concluded that the terms of the contract did not support the Estate's claim that PennDOT retained control of the job site. While the contract referred to a "partnering agreement" between the

_____

[12] "Although decisions by the Commonwealth Court are not binding on this Court, they may be persuasive." **Little Mountain Cmty. Ass'n, Inc. v. S. Columbia Corp.**, 92 A.3d 1191, 1198 n.14 (Pa. Super. 2014) (citation omitted). That is particularly so with respect to the Commonwealth Court's decision in **LaChance**, which the Supreme Court cited favorably in both **Beil**, **supra**, and **Farabaugh**, **supra**.

contractor and PennDOT, the agreement placed all responsibility for job site safety upon the contractor, *i.e.*, Baker, and specifically stated that Baker would "keep direct control of the contract[.]" *Id.* at 1060 (citation and emphasis omitted). Further, the Commonwealth Court concluded that PennDOT's right to inspect for safety violations, including the right to suspend work, did not establish that it "retained control" of the jobsite, or "make PennDOT the guarantor of the safety of Baker's employees." *Id.* at 1060-1061. Relevant to this appeal, the Court stated, "**Baker's contract performance had to meet PennDOT's contract specifications, but Baker controlled the manner of performance. This is how contractual relationships work.**" *Id.* at 1061 (emphasis supplied).

Lastly, the Commonwealth Court considered the Estate's claim that PennDOT's actual conduct on the jobsite demonstrated its control. Specifically, the Estate argued that PennDOT's field inspector directed that the pipe be grouted on the outside, when, as the Estate claimed, the contract provided for grouting only on the inside of the pipe. The Commonwealth Court rejected this argument holding:

> More to the point, PennDOT's directive to grout the outside of the pipe did not cause the accident. Rather, it was the method of digging, benching, bracing or shoring that trench that caused Decedent's fatal injuries. Responsibility for the trench belonged with Baker, which had absolute discretion in when and how to secure a trench. …
>
> There is simply no evidence that PennDOT retained or exercised any control over the manner of the trenching or the operational details of the trenching, which was the proximate cause of Decedent's injuries.

- 18 -

*Id.* at 1062.

In the present case, the contract provided quality specifications for the painting of the transmission poles.[13]  However, Nervatich's fall had nothing to do with these quality specifications.  Rather, Nervatich fell when the ladder he tied off on wobbled, and the single lanyard he used as fall protection slid off the rung.[14]  Moreover, Nertavich has failed to identify any **contractual provisions** that instructed QSC how to climb the poles safely to complete the painting work.[15]  Rather, the contract specifically provided that the contractor was "responsible for all climbing assist and rigging equipment necessary to complete this painting contract in an efficient manner[,]" and that it "shall be responsible to provide all personal protective equipment for all contractor personnel."  Contract, 8/30/2007, Attachment

_____

[13] Gallus Wukitsch, who at the time of the accident was a senior engineer in PPL's transmission and substation maintenance group, testified as on cross-examination during Nertavich's case-in-chief.  He explained why the contract included detailed requirements, such as the type of paint to use:  "[T]his Keeler and Long product, you don't pick up at, you know, Lowe's or Home Depot.  This is a specially mixed paint just for transmission utility poles."  N.T., 2/29/2012, at 51.  Further, he testified "[w]e wanted to make them understand that the paint we were specifying had certain requirements by the paint manufacturer and they had to follow that."  *Id.* at 53.

[14] During closing arguments, Nertavich's counsel stated that Nertavich fell "because[, one,] his lanyard slipped off the peg.  And he fell, two, because he didn't have a second lanyard attached which is how he had been working all week."  N.T., 3/8/2012, at 225-226

[15] As we will discuss *infra*, Nertavich also contends that PPL actually controlled how QSC climbed the poles.

A, at 3, ¶¶ 23 and 26. As PPL's senior engineer, Wukitsch testified, "[w]e were hiring them as the experts to do the painting work. We don't do that work." N.T., 2/29/2012, at 118. Therefore, we conclude the quality specifications set forth in the contract did not establish that PPL "retained control" of the operative details of the work which led to Nertavich's accident.[16]

Secondly, with regard to the terms of the contract, the trial court also found that PPL "retained control" of the job site over safety issues. **See** Trial Court Opinion, 6/14/2013, at 16-17. Specifically, the court noted that (1) the contract specified safety provisions to be followed, and (2) created the position of a PPL contract field supervisor, Wayne Grim, whose duty it was to monitor safety conditions at the work site and hold daily safety meetings.[17]

_____

[16] Nertavich argues that "PPL's glib mischaracterization of the operational detail in its contract as 'quality specifications that directed QSC what to do, not how to do it,' is insufficient to mask the reality and importance PPL placed on its requirements." Nertavich's Brief at 28. We disagree. Clearly, the contract provided specific, detailed painting specifications. However, how QSC was to achieve those specifications was up to the company, itself. John Pateras, the owner of QSC, testified that the PPL job was "a typical job for QSC" and it had done "many jobs like that" in the past. N.T., 2/28/2012, at 146; Videotaped Deposition of John Pateras, 7/22/2010, at 31. More importantly, as discussed **supra**, the contract did not specify how QSC was to access the poles, which was the cause of Nertavich's accident.

[17] As became evident during trial, Mr. Grim had no training or experience climbing steel transmission poles. N.T., 2/29/2012, at 154. However, he testified that the QSC workers "were the experts on doing this work." **Id.** at 170. Indeed, Nertavich confirmed that **no one** from PPL directed the painters as to how to do their jobs, and QSC had its own foreman, Mike Healy, who rotated between three or four QSC painting crews on the PPL
*(Footnote Continued Next Page)*

Accordingly, the trial court opined that Mr. Grim "had the duty to inspect worker fall protection[,]" but failed to do so. Trial Court Opinion, 6/14/2013, at 17.

However, the **Beil** Court made clear that a property owner who retains "a certain degree of authority over safety issues, such as supervising and enforcing safety requirements, and even imposing its own safety requirements at a work site, does not constitute control for purposes of imposing liability." **Beil**, **supra**, 11 A.3d at 469. Moreover, the terms of the contract in the present case clearly placed responsibility for job site safety upon QSC. The contract explicitly provided:

> The purpose of this article is to define Contractor's safety responsibilities under this Contract while performing Work on Company's work site. Although Company may monitor Contractor's safety performance, may review safety performance with Contractor's safety contact person, may suspend the Work for safety-related reasons, these actions are for the primary purpose of protecting Company personnel and property. **Contractor shall remain solely responsible for the safe performance of the Work under this Contract.** The provisions of this article shall be interpreted and construed in a manner consistent with Contractor's status as an independent contractor.

Contract, 8/30/2007, at 6-7, ¶ M (emphasis supplied). **See id.** at 5, ¶¶ D ("Contractor shall have safety program and work and safety rules for the

_(Footnote Continued)_ _____

job. N.T., 3/1/2012, at 161-163. Nertavich's co-worker Ryan Wheeler testified that Healy would yell at the painters if they were not using fall protection on a pole. **See** N.T., 2/27/2012, at 132; Videotaped Deposition of Ryan Wheeler, 7/21/2010 at 90.

Work[.]");[18] E ("Contractor shall take all reasonable precautions for the safety of all Contractor personnel engaged in the Work and shall continuously maintain adequate protection of all its Work, Company's work site, and persons to prevent damage, injury or loss."). **See also id.** at Attachment A, at 2, ¶ 12 ("Contractor must identify which structures can not be safely painted in [their] entirety prior to start of work on that structure."); Attachment A at 3, ¶ 26 ("The Contractor shall be responsible to provide all personal protective equipment for all contractor personnel.").

Furthermore, although the contract did give PPL "the right, from time to time, to undertake a safety performance audit of [QSC's] services," as well as the authority to suspend work for "safety-related reasons[,]"[19] that type of safety oversight was the same which the Supreme Court found permissible in **Beil**. **See Beil**, **supra**, 11 A.3d at 469 ("[W]e hold that a property owner retaining a certain degree of authority over safety issues, such as supervising and enforcing safety requirements, and even imposing its own safety requirements at a work site, does not constitute control for purposes of imposing liability."). **See also LaChance**, **supra**, 869 A.2d at 1060-1061 (stating that landowner's "inspection rights, exercised to assure itself that [independent contractor] performed its work safely, as [it] had

_____

[18] The contract listed the "Work Description" as "Transmission Structure Painting – Lehigh Region." Contract, 8/30/2007, at 1.

[19] **See** Contract, 8/30/2007, at 5-6, ¶ F.

agreed in its contract, did not make [landowner] the guarantor of the safety of [independent contractor's] employees[;]" parties' contract made safety the "contractual responsibility" of independent contractor).

Moreover, with respect to the contract, the trial court also found PPL "retained control" over safety issues through its specific designation of a contract field representative. The parties' contract specified that this representative would be "the daily source of contact to the Contractor in the areas of any questions, materials, quality assurance, general safety, work procedures and schedule." Contract, 8/30/2007, Attachment A at 2, ¶ 6. Moreover, the trial court reviewed PPL's internal safety guidelines, referred to as GSP-19, which stated that the contract field representative was to "monitor the contractor to ensure that safety requirements of the contract are adhered to." General Health & Safety Procedures, Section 19 (Revised-January 2005) at ¶ 7.2. Therefore, the trial court found that the PPL's establishment of the position of contract field representative demonstrated that it "retained control" over safety issues on the job site, including Nertavich's failure to use proper fall protection.

However, in *Farabaugh v. Pennsylvania Turnpike Com'n*, 911 A.2d 1264 (Pa. 2006), the Supreme Court rejected a similar claim that a landowner's hiring of an on-site safety supervisor established that the landowner retained control over the worksite.

In that case, the Pennsylvania Turnpike Commission ("PTC") hired New Enterprise Stone & Lime ("NESL") as general contractor for the construction

of a section of an expressway in western Pennsylvania. PTC also hired Trumbull Corporation ("Trumbull") as the "construction manager," responsible to administer and oversee several projects, as well as monitor the safety procedures of the other contractors. *Id.* at 1268. Farabaugh, an employee of NESL, was fatally injured when he drove a loaded, off-highway dump truck up a hill and the haul road he was traveling on collapsed due to instability in the hill. His Estate argued at trial that the haul road did not comply with safety measures. *Id.* at 1269. The trial court granted summary judgment in favor of PTC and Trumbull, and the Commonwealth Court reversed. *Id.* at 1270-1271.

On appeal, the Supreme Court reversed the Commonwealth Court's decision with respect to PTC's liability.[20] Farabaugh's Estate argued that PTC "retained control" over safety at the jobsite in three ways: (1) by showing a safety orientation videotape to all those employed on the jobsite, (2) by

_____

[20] The Supreme Court, however, affirmed the Commonwealth Court's reversal of summary judgment with respect to Trumbull, concluding:

> [u]nder the relevant contract language, … Trumbull owed a duty of care to Decedent based upon its contractual obligation to perform safety inspections and other monitoring functions. A determination of the scope of the duty and whether this duty was breached, however, requires further development of the record regarding Trumbull's role on the jobsite and the proximate cause of the accident.

*Id.* at 1267. Unlike in the present case, Trumbull was contractually obligated to monitor safety on the job site.

employing an on-site safety inspector, and (3) by contracting with Trumbull to provide construction management services. *Id.* at 1273-1274. However, the Supreme Court rejected the Estate's claims, relying primarily on the Commonwealth Court's language in *LaChance*, that "[s]ound public policy … dictates that [a landowner] monitor the safety of its highway construction projects and continue to pay its contractors to conduct safe job sites." *Id.* at 1275, *quoting LaChance*, 869 A.2d at 1064. Furthermore, the *Farabaugh* Court held:

> **It would likewise disserve public policy to impose liability on PTC for going one step further and hiring a contractor specifically to supervise safety issues on site in addition to requiring its general contractor to be responsible for safety under its own contract with PTC.** Instead, we conclude that under NESL's contract with PTC, PTC turned over control of the worksite to its general contractor, NESL, and did not retain control over NESL's means and methods for purposes of a Section 414 analysis.

*Id.* at 1275.

The same logic applies here. PPL's designation of a contract field representative, responsible for, *inter alia*, monitoring the contractor's safety practices, did not evidence its retention of control over all matters of work site safety. As clearly specified in the contract, QSC was "solely responsible for the safe performance of the Work under [the] Contract." Contract, 8/30/2007, at 7 ¶ M.

Further, we find the trial court's reliance on PPL's internal safety guidelines, or GSP's, to establish its retention of control of safety issues is misplaced. The GSP's are **internal** company documents that set forth safety

guidelines for PPL's employees to follow. N.T., 2/28/2012, at 50-51. In particular, while GSP 19, which governs contractor safety, states that the contract field representative "[w]ill monitor the contractor to ensure that safety requirements of a contract are adhered to[,]" the document also unequivocally states that "[t]he contractor is ultimately responsible for the safe performance of their employees[.]" General Safety & Health Procedures Section 19 (Revised–January 2005) at ¶¶ 5.4, 7.2. **See also id.** at ¶ 7.1. Therefore, although GSP 19 encourages PPL employees to monitor the safety of its independent contractors, it does not require PPL's control over all safety matters on the job site. Moreover, as stated above, the GSP's are internal documents, which are not provided to the independent contractors or their employees. N.T., 2/29/2012, at 136. Accordingly, we conclude that the evidence failed to establish PPL "retained control" of the job site based upon the "contractual provisions" between the parties. **See Beil**, **supra**, 11 A.3d at 467.

Turning to the second part of the **Beil** control test, PPL may still be found liable for Nertavich's injuries if it "retained control" over the job site based on its actual conduct. **Id.** While the trial court found PPL "exerted great control over access to the property,"[21] sufficient to find it liable for Nertavich's injuries, we again disagree.

---

[21] Trial Court Opinion, 6/14/2013, at 17.

- 26 -

Here, the trial court determined PPL "retained control" over access to the property in three ways: (1) by implementation of its "green tag" procedure; (2) by limiting QSC's access to the poles to the use of single-rail ladders; and (3) by providing these ladders to QSC without the necessary bolts to secure them to the transmission poles. *See* Trial Court Opinion, 6/14/2013, at 17, 21. PPL argues, conversely, that none of this evidence demonstrated its retention of control over the job site.

First, with respect to the implementation of the "green tag" procedure, it was PPL's method to ensure that QSC's workers would not come in contact with live electrical lines while painting the transmission poles. PPL's senior engineer, Wukitsch described the procedure as follows:

> Green tag procedure allows us to work on facilities. And what happens with the electric grid is when there's lightning or a bird contacts a line or some other thing, the lines trip out and automatically reclose.
>
> So if you're in your house, maybe occasionally over your lifetime you've seen your lights flicker real fast. Lines trip and reclose. They're designed to trip and reclose multiple times before there's a permanent fault on the line and they lock out.
>
> With a green tag permit, we actually go to the end points at the substations, at the circuit breakers. We change the condition of those circuit breakers so that if at any time those electrical lines would trip for any reason, they would automatically go to lockout and they wouldn't reclose.

N.T., 2/29/2012, at 14-15. Nertavich's expert witness, Stephen Estrin, testified that the procedure was necessary to ensure that QSC workers were painting a pole that was "no longer energized." N.T. 3/6/2012, at 104.

However, he opined that this procedure necessarily limited QSC's access to the job site:

> QSC was not given unfettered discretion of when, where and how to work. They had to get this tag before they could work. So if they arrived on the job site at 0700 and PPL had not issued the green tag, they could not access the pole and perform work. They would have to wait till [PPL] issued them the tag.

*Id.* at 105.

PPL contends, however, that this argument is similar to the controlled access claim rejected by the Supreme Court in **Beil**. In **Beil**, the College limited Beil's access to the building, and consulted with MPS as to where to erect its scaffolding, which Beil later used to access the roof. Nonetheless, the **Beil** Court held that the College's actions in regulating the use of, and access to, the building were not "qualitatively, conduct which evinces control over the manner, method, means, or operative detail in which the work is performed." **Beil**, 11 A.3d at 471. The Court opined:

> They are tangential to the substantive work of the contractor, and subcontractor. Simply stated, the College did not control the way the workers did their work.
>
> Moreover, the College's conduct regarding placement of MPS' scaffolding **does not directly relate to the decision of [the subcontractor's] employees to use MPS' ladders and scaffolding instead of [its] own equipment, which [it] contracted to provide, and [the general contractor] contracted to ensure was safe.** While MPS permitted the [subcontractor] roofers to use its scaffolding, [the general contractor] did not anticipate or rely upon the use of MPS scaffolding for access to the roof, and access was for [the subcontractor] to determine.

*Id.* (emphasis supplied and record citation omitted).

Similarly, here, the green tag permit simply indicated to QSC that the pole was not energized, and it was safe for QSC to perform its painting work, pursuant to the contract, by whatever means it saw fit. Indeed, the permit procedure did not directly relate to the decision of QSC concerning how its employees would climb the poles. As the **Beil** Court stated, "it would be a novel, if not absurd, interpretation of Section 414 if an independent contractor … could run amok at the work site without any limitations and without consideration of consequences." **Id.** at 470. Furthermore, the issuance of a green tag permit for the pole had nothing to do with the Nertavich's accident.[22] Accordingly, we find that the green tag permit procedure did not establish that PPL "retained control" over the job site sufficient to assign it liability for Nertavich's accident.

Second, the trial court also concluded that PPL controlled QSC's access to the poles by limiting the available ways to scale the poles to the use of single rail ladders. Trial Court Opinion, 6/14/2013, at 17. Indeed, Nertavich states that PPL "did not offer, provide, or even suggest any other means for QSC's access to its poles, such as an aerial lift." Nertavich's Brief at 30.

This finding, however, ignores the specific terms of the contract that QSC "shall provide all supervision, labor, services, materials, tools and

_____

[22] Had Nertavich been electrocuted as a result of the improper issuance of a green tag permit, we would be inclined to conclude that PPL maintained control over that aspect of the job site, and was subject to liability.

equipment" to complete the project, including all necessary "climbing assist and rigging equipment[.]" Contract, 8/30/2007, Attachment A at 1, 3, ¶ 23. Moreover, the contract provided that it was "the responsibility of the Contractor to field locate the structures designated for painting" and gave the bidding contractors the opportunity to "visit each individual structure in order to develop the bid." *Id.* at 1. The contract also stated that the contractor was responsible for identifying "which structures can not be safely painted in [their] entirety prior to the start of work on that structure." *Id.* at 2, ¶ 12. Accordingly, the terms of the contract placed all responsibility for determining how to access the transmission poles upon the knowledgeable independent contractor, QSC.

Furthermore, the testimony at trial supports PPL's contention that QSC, the experienced contractor, not PPL, determined how to climb the transmission poles. Indeed, QSC's owner, John Pateras, testified that the PPL project was "a typical job" for QSC. N.T., 2/28/12, at 146; Videotaped Deposition of John Pateras, 7/22/2010, at 31. He confirmed that the painters' use of "removable climbing assists," or single-rail ladders, to access the poles was a "typical occurrence," and there was nothing "unusual or peculiar about the job for PPL[.]"[23] *Id.* at 32. *See also* N.T., 2/27/2012, at

_____

[23] We note that Nertavich argues PPL was negligent for not questioning QSC about a provision in QSC's safety manual that stated, "Single rail ladders must not be used." QSC Painting, Inc. Corporate Worker Safety and Health Program (Revision No. 3), 11/27/1995, at 61. However, the above
*(Footnote Continued Next Page)*

132; Videotaped Deposition of Ryan Wheeler, 7/21/2010, at 97 (Nertavich's co-worker testfying that the use of "removable climbing devices" was not an "uncommon or unusual way to access that type of pole[.]").

Nertavich argues, however, that PPL "retained control" because it did not "offer, provide or even suggest any other means for QSC's access to its poles, such as an aerial lift." Nertavich's Brief at 30. However, this argument ignores the reality that QSC was the expert painting contractor, with 16 years of experience in industrial painting, and most of its experience working for power companies, such as PPL. N.T., 2/28/12, at 146; Videotaped Deposition of John Pateras, 7/22/2010, at 14-15. In fact, Wukitsch testified that all of the contractors who attended the pre-bid meeting, including QSC, understood that they would be accessing the transmission poles using "climbing ladders," and all the contractors told him they had used them before. N.T., 2/29/2012, at 110-111. PPL provided the job specifications, and deferred to the specialized expertise of the contractor to determine how to safely complete the work. Accordingly, we conclude PPL's failure to suggest or provide alternative means to access the transmission poles is not evidence of its retention of control over the job site.

*(Footnote Continued)* ───────────────

testimony by QSC's owner contradicts that provision, and we find that PPL was entitled to rely on the expertise of the independent contractor it hired to perform this specialized work.

Lastly, the trial court found PPL "retained control" of the project by supplying the single-rail ladders to QSC. The court opined that "QSC had to request these ladders from PPL to climb the poles." Trial Court Opinion, 6/14/2013, at 17. However, the trial court's focus on the fact that PPL "supplied" QSC with the ladders, ignores the fact that QSC asked PPL to supply their ladders only after it was unable to obtain them itself. Pateras described the circumstances surrounding QSC's request as follows:

> But I do remember in the bidding process that originally we were supposed to furnish the climbing devices. I called the company that we were supposed to buy it off of and they said they can't furnish it. Then I believe I had spoke[n] to PP&L and told them about the problem. And PP&L furnished some climbing devices.

N.T., 2/28/12, at 146; Videotaped Deposition of John Pateras, 7/22/2010, at 71. Pateras testified that he was at the warehouse when his employees picked up PPL's ladders, which he agreed were "appropriate for the work," and described as "perfectly normal." **Id.** at 73. Moreover, Wukitsch testified that after PPL located the single-rail ladders,

> [w]e showed [QSC] what we had and said: We would make these available for your use. **But it's your responsibility to look at them, to check them, make sure they're in good working order.** They were the ones who picked them up and took them out to the job site, installed them.

N.T., 2/29/2012, at 35 (emphasis supplied). Indeed, Wukitsch testified that PPL added the provision to the contract that "the contractor was responsible for all climbing assist and rigging equipment" after QSC requested to use PPL's ladders. **Id.** at 114-115. **See also** Contract, 8/30/2007, Attachment A at 3, ¶ 23. He explained that the language was added to make clear that

it was QSC's "responsibility to inspect the ladders, carry them, put them on, take them off." *Id.* at 115.

Therefore, while PPL made available to QSC the actual ladders the contractor used to climb the transmission poles, we do not find that, by doing so, PPL "retained control" of the job site. PPL only made the ladders available when QSC was unable to obtain them on its own. Significantly, there was no evidence that PPL **mandated** that QSC use these particular ladders to climb the transmission poles. Indeed, the language of the contract was clear: "Contractor is responsible for all climbing assist and rigging equipment necessary to complete this painting contract in an efficient manner." Contract, 8/30/2007, Attachment A at 3, ¶ 23. QSC, after inspection of the ladders, was free to reject them, or choose a different means to climb the poles. Accordingly, we conclude the trial court erred in finding that PPL's action in supplying the single-rail ladders Nertavich used the climb the transmission poles established its retention of control over the job site.[24]

_____

[24] We do not find that the decision of the Pennsylvania Supreme Court in **Byrd v. Merwin**, 317 A.2d 280 (Pa. 1974), mandates a different result. In that case, Byrd was an employee of an electrical subcontractor hired to perform renovation work in Olin's building. Merwin was the general contractor on the job. Byrd was injured when one of Merwin's teenaged sons dropped a section of a prefabricated staircase on Byrd's leg while Byrd was installing electrical wiring. The usual procedure in such situations was to install the staircase prior to wiring the house. *Id.* at 518.

*(Footnote Continued Next Page)*

Because we conclude that the evidence, viewed in the light most favorable to Nertavich, did not establish that PPL retained sufficient control over the job site, based on the contract provisions and actual control, to subject it to liability for Nertavich's injuries pursuant to Section 414 of the Restatement (Second) of Torts, we find the trial court erred in denying PPL's motion for j.n.o.v.

However, we are compelled to address Nertavich's alternative theories concerning PPL's "direct liability." Specifically, Nertavich contends that, regardless of PPL's liability, or lack thereof, pursuant to Section 414, he also presented evidence that PPL was directly liable for his injuries. He argues "**Beil** did not extinguish a landowner's **direct liability** when the landowner,

*(Footnote Continued)* _____

Byrd sued both Olin and Merwin, and a jury returned a verdict in his favor. However, the trial court granted Olin's motion for j.n.o.v., finding Byrd failed to establish Olin "retained control" of the work site pursuant to Section 414 of the Restatement. On appeal, the Supreme Court reversed, finding that Byrd established that Olin "exercised control as to supervision of the project" by instructing the electrical contractor "when to begin his work … and in what area to begin." **Id.** at 282. Further, Merwin, the general contractor, testified "that he was not in complete control of the project, but rather he was second in command to Olin." **Id.** The Court emphasized "[i]t must be remembered that it was Olin who ordered electrical work started before the staircase was installed." **Id.**

First, we note that **Byrd** was a plurality decision, with three justices joining the majority, two justices concurring in the result, and one justice dissenting. In addition, the facts in **Byrd** were clear that the owner retained control of the work site and actually instructed the subcontractor when and where to begin his work. There is no such degree of control in the present case.

as here, engages in its own, independent negligent conduct that directly contributes to a worker's injuries." Nertavich's Brief at 32 (emphasis in original). While we agree that Nertavich's argument is a correct statement of law, we conclude that his claims of direct negligence in the present case fail.[25]

Nertavich claims PPL was directly liable for his injuries based on the following theories: (1) "gratuitous undertaking" pursuant to Section 323 of the Restatement (Second) of Torts, because PPL provided single-rail ladders,

_____

[25] We note that both the trial court and Nertavich cite **Chenot v. A.P. Green Services, Inc.**, 895 A.2d 55 (Pa. Super. 2006), for the proposition that a land owner may be directly liable to the employee of an independent contractor for its own negligent acts. Trial Court Opinion, 6/14/2013, at 20 n.137; Nertavich's Brief at 32. However, we disagree that **Chenot** stands for such a broad principal of law. Indeed, the **Chenot** Court simply found that the "peculiar risk" doctrine applied.

In that case, Chenot was exposed to asbestos dust while working as an employee of Philip Carey, an independent contractor retained by Koppers Company to install new insulation in one of its manufacturing facilities. Chenot later contracted mesothelioma as a result of this exposure. **Chenot**, **supra**, 895 A.2d at 58. In concluding that Koppers owned a duty of care to Chenot, this Court found that an owner who possesses "superior knowledge" of a danger on his premises has a duty to warn an independent contractor of that danger, whether or not the contractor exercises full control over the premises. **Id.** at 64.

Therefore, rather than stand for the broad proposition that a landowner may be directly liable to the employee of an independent contractor for its own negligence, Chenot applied the limited "peculiar risk" doctrine, a doctrine which the trial court found inapplicable in the present case. **See** N.T., 3/7/2012, at 95 (trial court sustaining objection to "peculiar risk" jury charge).

without accompanying bolts to secure the ladders to the transmission poles, and provided an unqualified contract field representative to monitor safety practices on the job site; (2) negligent design of the transmission poles, because PPL failed to require the pole manufacturer to include lifeline attachment points on the poles; and (3) PPL's violations of OSHA[26] and the National Electric Safety Code (NESC). For the reasons that follow, we conclude that none of these theories should have been presented to the jury.

With respect to Nertavich's claim regarding "gratuitous undertaking," Section 323 of the Restatement (Second) of Torts, commonly known as the "Good Samaritan Law,"[27] imposes liability when one gratuitously undertakes to perform a service for another:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965).

_____

[26] Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq*.

[27] *Filter v. McCabe*, 733 A.2d 1274, 1276 (Pa. Super. 1999), *appeal denied*, 758 A.2d 1200 (Pa. 2000).

First, Nertavich contends that when PPL "gratuitously" chose to supply QSC with the single-rail ladders, it did so negligently when it failed to also provide the bolts to secure the ladders to the transmission poles. We disagree. There is simply no evidence that PPL's failure to supply the bolts increased the risk of harm to Nertavich or that Nertavich, or, in fact, QSC, relied upon PPL's actions to their detriment. QSC was intimately familiar with the single-rail ladders supplied by PPL, and, indeed, had requested them. QSC's employees had used these ladders many times in the past, and were aware that the ladder could be secured to the transmission pole with a bolt. For example, another QSC painter, Donald Thompson, testified that he was involved in the PPL job, and actually "pegged" and "depegged" the ladders in question. N.T., 3/7/2012, at 157. He explained that he had painted more than 5,000 poles, and while some had ladders permanently attached, "most of the time" he would peg the ladders himself. *Id.* at 157-158. He also testified why he never used bolts when he installed the single-rail ladders:

> We wouldn't be able to get them back out because the primer, it gets hard. The red primer was 6000 primer. It sets in there, and you have to sometimes beat them out to get it to come back out.

*Id.* at 158. He reiterated that he only used the bolts "when it's stationary, where they're not coming off" and "never" in a removable application, such as their use on the PPL job. *Id.* Moreover, Nertavich, himself, testified that prior to the PPL job, he had painted approximately two dozen similar

transmission poles, and had used "chicken ladders" to climb six poles, including the one in question. N.T., 3/1/2012, at 23, 25-26. He testified he had never seen a bolt attaching the ladder to the poles on any job. *Id.* at 36-37.

Therefore, we fail to see how PPL's failure to supply the bolts with the climbing ladders increased Nertavich's risk of harm, particularly, when his own co-worker acknowledged that QSC **never** used bolts to attach the single-rail ladders to the poles in a temporary application, and Nertavich, himself admitted he never saw a bolt attaching the ladder to the pole on any job. Moreover, because Nertavich's employer was an **industrial painting expert**, he cannot establish that his accident resulted from **QSC's reliance** upon PPL's failure to supply the bolts.

Second, Nertavich argues PPL was directly liable for his injuries when it chose to provide an on-site contract field representative to ensure job site safety procedures were being followed, but then negligently appointed Grim to the position, who had no training or experience on the proper way to climb and tie-off on a transmission pole. We conclude, however, this argument runs counter to the dictates of **Beil**, **Farabaugh**, and **LaChance**, as well as the parties' written contract.

As our sister court stated in **LaChance**, "[s]ound public policy … dictates that [a landowner] monitor the safety of its … construction projects and continue to pay its contractors to conduct safe job sites." **LaChance**, **supra**, 869 A.2d at 1064. Furthermore, in **Farabaugh**, the Supreme Court

concluded that when a landowner goes "one step further and hir[es] a contractor to supervise safety issues on site," the same public policy concerns dictate that such actions do not constitute an owner's control of safety issues at the job site. *Farabaugh*, *supra*, 911 A.2d at 1275. Moreover, in *Beil*, the Supreme Court reiterated that a property owner who maintains "a certain degree of authority over safety issues, such as supervising and enforcing safety requirements, and even imposing its own safety requirements at a work site, does not constitute control for purposes of imposing liability." *Beil*, *supra*, 11 A.3d at 469 (footnote omitted). To hold that an owner who designates an, albeit inexperienced, on-site safety representative may be held liable under Section 323 of the Restatement, would undercut the case law cited above, as well as the general rule that a landowner is generally not responsible for the acts or omissions of his independent contractor.[28] *Id.* at 466.

Furthermore, the imposition of liability under these circumstances would run contrary to the clear terms of the parties' contract. While the contract provided for the designation of a contract field representative, who would be "the daily source of contact to the Contractor in the areas of any

_____

[28] Our conclusion might be different if there was any evidence that Grim provided instructions or directions to Nertavich or the other QSC employees. However, the testimony was undisputed that Grim provided no direction at all.

questions, materials, quality assurance, general safety, work procedures and schedule[,]"[29] it also clearly stated that the "Contractor shall remain **solely responsible** for the safe performance of the Work under this Contract." Contract, 8/30/2007, at 7, ¶ M (emphasis supplied). Therefore, we conclude PPL could not have been liable under the theory of a "gratuitous undertaking" pursuant to Section 323 of the Restatement (Second) of Torts.

Next, Nertavich claims PPL was directly liable for his injuries because it failed to require the transmission pole manufacturer, Thomas & Betts, to include lifeline attachment points, or vangs, on the poles. He argues:

> PPL was responsible to advise Thomas & Betts of any attachment points it wanted on its poles because PPL was in the best position to know what it needed to do on its poles by way of access and maintenance. PPL knew that its poles would need to be repainted. PPL knew that workers would need to access its poles to paint them. PPL, by ordering the ladders to access and work on its poles, knew that workers would need to climb the poles to perform the work. PPL, by reviewing QSC's safety manual submitted as part of QSC's bid to do the work, knew or should have known, that QSC prohibited the use of single rail ladders. PPL knew or should have known that such ladders did not provide adequate safe tie-offs for the lifelines needed by the workers to perform their duties safely and were also proscribed by OSHA.

Nertavich's Brief at 34 (record citations omitted).

Nertavich's argument, which avers PPL's negligent design of the transmission pole, attempts to end-run the trial court's pretrial determination that the statute of repose barred any claim based upon the

_____

[29] Contract, 8/30/2007, Attachment A, at 2, ¶ 6.

- 40 -

pole's manufacture or design. Indeed, prior to trial, the trial court granted pole manufacturer, Thomas & Betts's, motion for partial summary judgment based on Thomas & Betts's contention that any claim challenging the design or manufacture of the transmission pole was barred by the statute of repose, 42 Pa.C.S. § 5536. The statute mandates, in relevant part, that any action brought against a person "furnishing the design, planning, supervision or observation of construction, or construction of any improvement to real property must be commenced within 12 years after completion of construction of such improvement[.]"[30] 42 Pa.C.S. § 5536(a). Therefore, any challenge to **PPL's** design of the pole should be similarly barred.[31]

In fact, during argument at the close of testimony, Nertavich's counsel agreed that the "[t]he pole is not [at issue] in this case." N.T., 3/8/2012, at

_____

[30] Wukitsch testified that the transmission pole that Nertavich was painting at the time of the accident was purchased by PPL from Thomas & Betts "in the mid-'80s, '86, '87." N.T., 2/29/2012, at 17. Therefore, it had been in place more than 20 years on September 23, 2007, the date of the accident.

[31] In a footnote in his brief, Nertavich addresses PPL's claim that the jury was tainted by hearing evidence of the defective pole, which was not an issue in the case. He claims that the only evidence he produced regarding the pole design was "PPL's negligent failure to specify lifeline attachment points" and that PPL's counterclaim against Thomas & Betts, in which PPL asserted the pole was defective, was not dismissed. Nertavich's Brief at 33 n.7. However, PPL did not assert a claim against Thomas & Betts claiming that the pole was defective. Rather, its counterclaims asserted only allegations of joint and several liability and contribution/indemnification. **See** Answer of Defendant, PPL Electric Utilities Corporation to Plaintiff's Second Amended Complaint, May 11, 2011, at ¶¶ 119-120.

190. Counsel explained: "There was summary judgment granted on the pole, on any design defect claims about the pole on the grounds of the statute of repose, Your Honor. So, the pole is not in this case. It's just the ladder." **Id.** Therefore, the jury should not have considered any negligent design claim with regard to PPL's purported direct liability.[32]

Lastly, Nertavich argues the jury could have found PPL directly liable based upon its alleged violations of OSHA and NESC. Indeed, the trial court opined that Nertavich's expert witnesses, Stephen Estrin and Gregory Booth, "testified that under industry practice, which included OSHA and the NESC, Defendant PPL breached its duties[,]" and this evidence of "PPL's direct negligence was admissible to prove PPL breached a duty owed to [Nertavich]." Trial Court Opinion, 6/14/2013, at 21-22. While we agree that testimony concerning industry standards and regulations may be admissible to determine the standard of care in a particular case, we conclude that, here, the experts improperly opined on the primary question as to whether or not PPL owed a duty to Nertavich.[33]

At trial, both Estrin and Booth testified that under OSHA and NESC, respectively, PPL had a **duty** to monitor QSC worker safety at the job site.

---

[32] Furthermore, as discussed above, these type of transmission poles were typical of the kind QSC regularly contracted to paint. **See** N.T., 2/28/2012, at 146; Videotaped Deposition of John Pateras, 7/22/2010, at 31-32.

[33] It is well-established that "[t]he existence of a duty is a question of law for the court to decide." **R.W. v. Manzek**, 888 A.2d 740, 746 (Pa. 1987).

N.T., 3/6/2012, at 119; 3/1/2012, at 250. However, as we have already determined, PPL, as a landowner who hired an independent contractor, did not retain sufficient control over the "methods of work, or as to operative detail" to "implicate the exception to the **general rule** against liability[.]" *Beil*, *supra*, 11 A.3d at 467 (emphasis supplied in part and omitted in part), citing Restatement (Second) of Torts § 414 cmt. c.

In support of his contention that the expert testimony was admissible in the present case, Nertavich cites a decision of the federal appeals court in *Rolick v. Collins Pine Co.*, 975 F.2d 1009 (3rd Cir. 1992), *cert. denied*, 507 U.S. 973 (1993). In that case, Rolick, an independent contractor, was hired by Kane Hardwood Division to cut and haul timber that Kane had purchased from the United States Forest Service. Rolick sustained serious injuries when a branch from a rotten birch tree struck him from behind as he was measuring another tree that he had just felled. Rolick filed a negligence action against Kane based upon Pennsylvania law. However, the jury returned a verdict for the defendant. *Id.* at 1011.

On appeal, Rolick argued, *inter alia*, that the trial court erroneously excluded "material evidence of the standard of care owed by defendants to plaintiff[,]" specifically, expert testimony concerning Kane's purported violation of an OSHA regulation. *Id.* at 1012. The Third Circuit Court agreed, concluding:

> We can think of no reason under the Federal Rules of Evidence why the OSHA regulation is not relevant evidence of the standard of care **once it is determined, as we have done,**

> **that under Pennsylvania law the defendants could owe plaintiff a duty of care.** It is important to reiterate that to use the OSHA regulation as evidence here is not to apply the OSHA itself to this case. Rather, it is to "borrow" the OSHA regulation for use as evidence of the standard of care owed to plaintiff. This is precisely how the Pennsylvania state courts had employed OSHA regulations. ***See e.g. Brogley v. Chambersburg Eng'g Co.***, 306 Pa.Super. 316, 452 A.2d 743, 746 (1982).

*Id.* at 1014 (emphasis supplied). Therefore, the Third Circuit concluded evidence of the violation of an OSHA regulation was relevant to the issue of the standard of care, **only after** the court first determined that the defendant owed a duty of care to the plaintiff.

In that case, the Court found that Kane owed a duty to Rolick pursuant to Section 343 of the Restatement (Second) of Torts, which provides that "a possessor of land must exercise reasonable care to protect invitees from non-obvious dangerous conditions on the land." *Id.* at 1011. The Court recognized that,

> [a]lthough the duty owed to an independent contractor **varies depending upon the control the possessor maintains over the work** … it is a general rule that a possessor of the land must still use reasonable care to make the premises safe or give adequate and timely warning of **dangers known to him but unknown to the contractor**….

*Id.* (citation omitted and emphasis supplied). Section 343, however, is inapplicable in the present case because none of the purported causes of Nertavich's fall — *i.e.*, the failure to use a second lanyard, the use of a "chicken ladder," — constituted dangers known to PPL, but unknown to Nertavich or his employer, QSC. Moreover, as discussed *supra*, we conclude

that the evidence presented by Nertavich did not establish that PPL "retained control" of the work site sufficient to confer liability. Accordingly, because we conclude that PPL owed no duty to Nertavich, the employee of an independent contractor, it would have been improper for the jury to consider evidence concerning PPL's purported violations of industry standards. As such, we find Nertavich's alternative arguments for relief based upon PPL's purported "direct liability," unavailing.

Therefore, because we conclude that PPL was entitled to judgment as a matter of law, we conclude the trial court erred in failing to grant PPL's post trial motion for j.n.o.v. **See Egan**, **supra**. Accordingly, we reverse the judgment entered against PPL, and remand for the entry of j.n.o.v. Because our disposition of PPL's first issue is dispositive, we need not address its remaining claims.

Judgment reversed. Case remanded for entry of j.n.o.v. Jurisdiction relinquished.

Strassburger, J., files a Dissenting Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/27/2014

- 45 -